1                    **UNITED STATES DISTRICT COURT**

2                     **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **United States of America,**        )
                                          )
5                        Plaintiff,       ) **CR-14-00191-PHX-DGC (DKD)**
                                          )
6           vs.                           ) Phoenix, Arizona
                                          ) August 11, 2015
7    **Marc Turi, Turi Defense Group,**   )
                                          )
8                        Defendants.      )
     _____)

9

10

11

12

13          **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

14          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15          <u>**STATUS CONFERENCE/MOTION HEARING**</u>

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

3    For the Government:

4            U.S. Attorneys Office
             By:  **KRISTEN BROOK,** ESQ.
5            By:  **DAVID PIMSNER,** ESQ.
             40 N. Central Ave., Ste. 1200
6            Phoenix, AZ  85004

7

8    For the Defendants:

9            Perkins Coie, LLP
             By:  **JEAN-JACQUES CABOU,** ESQ.
10           By:  **THOMAS D. RYERSON,** ESQ.
             BY:  **ALEXIS DANNEMAN, ESQ.**
11           P.O. Box 400
             Phoenix, AZ  85001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

16:29:08  1

2

3      THE COURTROOM DEPUTY:  Criminal case 2014-1991,

4  United States of America versus Marc Turi, and others, on for

15:02:45  5  a status and motion hearing.

6      MR. PIMSNER:  Good afternoon, Your Honor.  David

7  Pimsner and Kristen Brook for the United States.

8      THE COURT:  Good afternoon.

9      MR. CABOU:  Good afternoon, Your Honor.  Jean-Jacques

15:02:55  10  Cabou, Thomas Ryerson, and Alexis Danneman from Perkins Coie

11  on behalf of defendants, and also present is our client,

12  Mr. Turi.

13      THE COURT:  Good afternoon.

14      Good afternoon, Mr. Turi.

15:03:04  15      All right.  Counsel, I think we should jump right to

16  it and let me address a number of the motions that are

17  pending.  And then we can talk about issues you want to raise

18  and about the schedule in the case.

19      I want to talk first about the motion for an order to

15:03:36  20  show cause filed by the defense on June 16th.  It is at Docket

21  171.  It's fully briefed and I've read the briefs.  The

22  disagreement between the parties is the fact that the

23  government has not disclosed any Category 2 documents as

24  identified in my order that is at Docket 63.  And the defense

15:04:11  25  cites to some public disclosures that have been made that the

15:04:16  1   defense believes would come within Category 2.  The government

2   disagrees and says those aren't documents covered by

3   Category 2.  And the parties seem to have a disagreement over

4   what the words "effort" and "relate" in Category 2 mean.

15:04:40  5        Do you have additional thoughts you want to make,

6   defense counsel, before I rule on this issue?

7        MR. CABOU:  Your Honor, I know there's a number of

8   things on the calendar so I don't want to take too long.  We

9   of course would be happy to answer any of the Court's

15:05:00  10  questions on this matter.

11        I would note that as the briefing sets out, the

12  construction of the order that the government is urging is

13  quite constrained and quite narrow, and we believe that the

14  small subset of documents that had been available through FOIA

15:05:20  15  disclosures in other litigation fall within Category 2, and

16  that's really the heart of our motion.  We don't know what

17  else might be out there but this, to us, combined with the way

18  in which discovery has gone in this matter suggests that it is

19  appropriate at this point to put upon the government the

15:05:37  20  burden to explain why it hasn't done more in producing these

21  documents.

22        And the order itself, which uses kind of regularly

23  understood language to instruct the government as to what to

24  look for and what to find, seems quite clearly to encompass

15:05:57  25  the documents that were made available in the DC FOIA

15:06:00   1   litigation.  And with that, although we don't have additional

2   documents, we believe that there's sufficient evidence for the

3   Court to ask the government to come forward now and explain

4   what it's been up to with regard to the searching and the

15:06:13   5   production of Category 2 documents.

6         THE COURT:  Mr. Cabou, a question for you.  How is a

7   senator's advocating that the United States should facilitate

8   third-party arms transfers to the rebels accurately described

9   as an effort by the United States to provide arms to the

15:07:07   10  Libyan rebels?

11        MR. CABOU:  Your Honor, the order, as we construe it

12  at least, commands production of documents that relate to an

13  effort to arm the rebels.  So the documents themselves need

14  not constitute an effort to arm the rebels, they just need to

15:07:25   15  relate to it.

16        And if we armed the rebels, as publicly reported in

17  many, many sources and as we strongly believe happened and as

18  we believe at least one witness told the grand jury, then

19  documents about that process relate to that effort.  They're

15:07:43   20  about the same thing.

21        So the documents themselves do not need to either

22  individually or in total amongst the three or four documents

23  we've referenced, that small universe of documents doesn't

24  need to be the effort itself, it can relate to it.

15:07:59   25        And even accepting government's construction that

15:08:01  1   this word "effort" means a, quote, serious attempt, as they

2   were able to unearth in one dictionary definition in one

3   dictionary, they relate to an effort if the effort happened.

4   If the effort happened, it's serious.  It happened.

15:08:18  5        So these documents themselves do not need to be the

6   beginning and the end of the measure of whether the effort was

7   serious.

8        THE COURT:  Under that construction, Mr. Cabou, any

9   e-mail, any memo, any piece of paper anywhere in the State

15:08:39  10  Department or anywhere in the U.S. military where somebody

11  suggests we ought to find a way to get weapons to the Libyan

12  rebels would fall within Category 2; right?

13       MR. CABOU:  We believe that's an appropriate and fair

14  reading of the order.  And where we are looking here for all

15:08:56  15  evidence, direct and circumstantial, that suggests that this

16  happened, that this event, providing of military assistance to

17  the rebels, especially through clandestine means, then, yes,

18  that relates to the effort.

19       THE COURT:  But that's different.  I mean, an e-mail

15:09:11  20  from one State Department person to another saying we ought to

21  think about this is not proof that it happened, as you just

22  suggested.

23       MR. CABOU:  Well, Your Honor, if I suggested that I

24  certainly didn't mean to suggest that.  There's a difference

15:09:24  25  between being proof that it happened, which is not the

15:09:27  1    language used by the order, and I'm referring to the order

2    myself right now just so we each have it in front of us.

3          But Category 2 seeks documents or other evidence

4    relating to instances in which the United States assisted or

15:09:48  5    considered assisting.

6          THE COURT:  Right.  I looked at that language as

7    well, and I assumed that what I was thinking at the time I

8    wrote the order was if there were instances, then documents

9    relating to those instances should be disclosed.  That's what

15:10:05  10   I intended when I think I rewrote the language a bit to say if

11   it relates to an effort to arm rebels, something that actually

12   occurred, then it should be disclosed.  But you're reading it

13   much more broadly to say even if it was discussed by somebody,

14   unrelated to any actions to taken to try to arm them, it's

15:10:25  15   within this request.

16         MR. CABOU:  Okay, Your Honor, I think I understand

17   the distinction you're trying to draw.  Perhaps with specific

18   reference to, I believe it's the third of the three e-mails

19   that were discussed in the motion, which was at Exhibit C to

15:10:41  20   the motion, that's an e-mail from a senator -- or e-mail

21   discussing senator's desires about military assistance.

22   Perhaps a recitation of a senator's position might not relate

23   to that effort.  I suppose I can see that construction, Your

24   Honor.

15:10:59  25         But the other two e-mails in which high-ranking

15:11:03  1   officials of the State Department, which is the policy-making

2   body of the United States government with direct oversight

3   specifically on the issue of the provision of defense

4   articles -- as we know, it was ultimately Mr. Turi's

15:11:18  5   application to the State Department that brought us all here

6   today.  So certainly the State Department's at the center of

7   U.S. policy when it regards provisions of arms abroad,

8   certainly.

9         And in this case we provided to the Court two

15:11:34 10   separate e-mails that talk about facilitation of third-party

11   arms transfers to the rebels.

12         Now, Your Honor, whether those e-mails themselves

13   authorized it, that's not what we're arguing.  But neither

14   does Your Honor's order, and we think appropriately so,

15:11:54 15   neither does Your Honor's order require we only get access to

16   the ultimate decisional documents.  That's not what the Court

17   ordered and we believe that that order was appropriate.

18         THE COURT:  Well --

19         MR. CABOU:  If these are documents which relate to

15:12:09 20   the efforts to arm the rebels, we're entitled to them.  We're

21   entitled to tell the jury, ladies and gentlemen of the jury,

22   the Secretary of State and her highest staff members were

23   actively contemplating providing exactly the type of military

24   assistance that Mr. Turi is here to answer for, as of this

15:12:27 25   date.

15:12:27  1        THE COURT:  Well, my problem, Mr. Cabou, is, again,

2   there is a difference between actively contemplating and doing

3   it.  But the quote that you give me from the Secretary of

4   State's e-mail says using private security experts to arm the

15:12:44  5   opposition should be considered.  That doesn't suggest it

6   happened; it's not a directive that it happen.  It's

7   effectively saying "we should think about that."

8        MR. CABOU:  I agree with you, Your Honor.  We are not

9   and did not say in the motion and are certainly not saying now

15:12:58  10   that that -- that these particular documents that have been

11   publicly released are sufficient to be evidence that we

12   conducted military assistance to the TNC.  But they're strong

13   evidence that this was being contemplated and that other

14   evidence exists.

15:13:15  15        This is the best gateway we have, Your Honor.  We

16   have publicly disclosed documents from the Secretary of State

17   saying that this should be considered, and the specific "this"

18   which was to be considered is the use of third parties to arm

19   the rebels.

15:13:30  20        Mr. Turi is here because he's a third party who was

21   trying to do arms business in the Middle East.  And the idea

22   that these e-mails would show discussions at the highest level

23   are not enough to ask the government to now tell us what

24   they've been up to with regards to searching for and providing

15:13:50  25   these documents?  We disagree with that.  We think this is

15:13:54    1    enough.

2          The government has not produced any documents at all

3    from policy-making officials at State, PMRSAT, and NEA.  Zero

4    documents regarding the subject of the order.  And these

15:14:08    5    documents seem to be within that to us, and they further

6    suggest that there are others because it's somewhat unlikely,

7    in our view, that in response to e-mails from the State

8    Department chief of staff or the State Department secretary

9    there were no further communications.

15:14:27   10          Now, if there were communications saying let's do

11    this, for example, or we should talk to person X, person Y,

12    person Z, my guess is those would be classified, so of course

13    they wouldn't be in the New York Times and and wouldn't be

14    subject of FOIA.  But they should be released here and at

15:14:44   15    least part of the process of reviewing that information.

16          What doesn't make sense from where we sit, and

17    admittedly we have a bystander seat to a lot of this, we do

18    not know what's behind the curtain, but from where we sit, the

19    fact that there are these documents in public suggest that

15:15:00   20    there are more documents in private.

21          THE COURT:  All right.  I understand your position.

22    Government counsel.

23          MR. PIMSNER:  Your Honor, we have provided Mr. Cabou

24    in a classified setting some information regarding Category 2,

15:15:16   25    without going into any of the details.  And we stand by our

15:15:22 1   response that any time anybody, any member of the Senate or

2   House or State Department said maybe this is a good idea, that

3   that is not sufficient to make -- whether or not an effort was

4   undertaken to arm the rebels.  That's as best we can.

15:15:41 5   If you want every time this topic was discussed we

6   had to disclose every possible document that exists, it's not

7   going to prove the premise that Mr. Cabou is asking it to

8   prove.

9   THE COURT:  Part of my problem on this issue is that

15:16:04 10   I've read your disclosure to Mr. Cabou in a classified

11   setting.  It would be helpful to discuss that specifically,

12   but it's viewed as classified.  How do you propose we -- I

13   could have that discussion with government counsel and

14   Mr. Cabou who -- I don't think the other counsel have yet

15:16:30 15   received clearance.

16   MR. PIMSNER:  Mr. Slade would have to make

17   arrangements to have an area prepared where that discussion

18   could take place, as we have in other hearings.

19   THE COURT:  Couldn't seal the courtroom and do it?

15:16:54 20   MR. PIMSNER:  I defer to Mr. Slade.

21   MR. SLADE:  Can I have a moment?

22   THE COURT:  Pardon?

23   MR. SLADE:  Can I have a moment with you?

24   THE COURT:  Sure.

15:17:06 25   (The Court and Mr. Slade confer.)

12

15:17:51    1        THE COURT:  Something Mr. Slade suggested is we have

2   a court reporter here who is cleared for national security

3   type matters.  When Traci comes back, I'm going to ask her to

4   find out if she's here today, and we could go in the jury room

15:18:05    5   at the end of this hearing with Mr. Cabou and government

6   counsel and that court reporter and have a discussion.

7        (The Court and the courtroom deputy confer.)

8        THE COURT:  I would really like to have that

9   discussion in a way that is more specific than what we can

15:18:42   10   have in this setting.  So let's put this issue on hold and

11   come back to it after we find out if Ms. Adams is available.

12        (The Court and the courtroom deputy confer.)

13        THE COURT:  Okay.  She's available.  We'll do it

14   somewhere in the courthouse, an undisclosed location in the

15:19:15   15   courthouse, and we'll address it in detail.

16        MR. PIMSNER:  Yes, Your Honor.  Thank you.

17        THE COURT:  Let me make a note here.

18        Okay.  Let's talk about the defense motion at Docket

19   217 to compel disclosure of information relating to claim of

15:20:12   20   State secrets.

21        I've read the motion, the response, and the reply.

22   Mr. Cabou, or other counsel, do you want to say anything more

23   on that motion?

24        Ms. Danneman.

15:20:27   25        MS. DANNEMAN:  As Mr. Cabou said, we know we have

13

15:20:30   1    limited time, so if you have any specific questions, please

2    ask me.

3         I think our general position is that the defendant

4    has a right to meaningfully test his claim and the right to

15:20:42   5    fair trial under the Fifth and Sixth Amendment.  There's also

6    a general presumption against ex parte hearings and the public

7    has the First Amendment right to that information.

8         The government in its response did not contest the

9    defense's right to the information, but it just put up two

15:21:01  10    barriers as to why we couldn't get that information.  We don't

11    think that either of those is sufficient to prevent the

12    defense from getting it in light of its general due process

13    right to that information, we believe.

14         Not only do we think that the information is probably

15:21:19  15    not classified, the name of the -- the name of the person that

16    signs the document and whether or not they personally consider

17    the document, but also at least one of the defense counsel has

18    security clearance.  We know that isn't enough to grant us

19    access to the information as a right, but we don't think that

15:21:39  20    that's a barrier to us getting the information.

21         We also think that CIPA Section 4, while it does

22    permit the Court to conduct proceedings in private, in this

23    case in particular it, one, doesn't prevent us from getting

24    that information and, two, we think that given the rationale

15:21:56  25    for those ex parte hearings none of that rationale applies to

15:21:59  1    prevent us from getting at least the name of the person who

       2    signed the document and whether they personally considered the

       3    information.

       4              THE COURT:  Okay.  Thank you.

15:22:07  5              Anything from the government an that issue?

       6              MS. BROOKE:  Briefly, I want to highlight that CIPA

       7    does create a pretrial procedure in order for us to deal with

       8    classified information and it's the government's opinion that

       9    in a classified document or declaration that any sign or

15:22:24 10    component of that declaration too is classified and subject to

      11    CIPA litigation.

      12              I also want to highlight briefly in regard to

      13    defense's reply about the nature of the classified

      14    information.  *United States versus Daoud* is a Seventh Circuit

15:22:39 15    case the government cited for Your Honor in our response

      16    related to the protective order.  And in particular it cites

      17    755 F.3d 479.

      18              And what this opinion does is it talks specifically

      19    about the importance of protecting classified information and

15:22:59 20    ensuring that not only the receiver would be somebody who is

      21    cleared but also has a reason to know.  This opinion goes on

      22    to talk about how well over a million people in the United

      23    States have clearance and therefore it's important for there

      24    to be a determination of a need to know in this particular

15:23:20 25    setting.

15:23:20   1          So the government would just highlight the fact that

2     CIPA exists for a reason and we rely upon the Court to make a

3     determination, if any, in that particular setting.

4                THE COURT:  Okay.

15:23:31   5          Any other thoughts, Ms. Danneman?

6                MS. DANNEMAN:  No, Your Honor.  We don't disagree

7     that it's the -- that many people have security clearances and

8     we're not entitled to information as of right, but in this

9     case in particular we think that Mr. Turi has a right to know

15:23:48  10     this information, something that we briefed heavily and

11     contested from the outset.  So, yeah.

12               THE COURT:  Okay.  Thank you.

13          What we're dealing with here is a declaration that

14     has been provided sealed and ex parte in a CIPA Section 4

15:24:04  15     proceeding, which can be ex parte because it considers

16     confidential information.  I have afforded the defendants an

17     opportunity to address the level at which that declaration

18     needs to be made within an agency and the level of personal

19     knowledge.  That was briefed and I made a decision on what was

15:24:23  20     required and I gave the government 21 days to submit a

21     document.  The government has submitted a document.

22          My view is that knowing who signed that document and

23     knowing whether or not they said "I make this declaration on

24     personal information" is not something that is going to equip

15:24:46  25     the defense in some unique way to test this.  I mean, I can

15:24:50   1   read it and see whether it complies with that requirement.  So

2   can anybody else.

3       And it seems to me if the notion is that a CIPA

4   classified submission under Section 4 should be subject to

15:25:04   5   testing by the defense by some level of disclosure, that's

6   just inconsistent with the notion of a CIPA Section 4

7   proceeding.

8       Because in this case I am fully capable of seeing

9   whether or not the document says it's authorized by an agency

15:25:19  10   head on the basis of personal knowledge, I don't see this as

11   something that the defense needs to test or which we therefore

12   should start making inroads into CIPA Section 4 procedures, so

13   I'm going to deny the motion at Docket 217.

14       Let's talk next about the motion to compel the grand

15:25:45  15   jury transcript.  This is at Docket 142.

16       I don't think I need any more argument on this.  I

17   will tell you -- well, if you all have an additional thought

18   you want to make, I'm happy to hear it.

19       MR. RYERSON:  None that wasn't fully briefed, Your

15:26:06  20   Honor, several months ago.  We'd just be beating a dead horse

21   on this one.

22       THE COURT:  I don't want to deny you the chance to

23   make an argument, Mr. Ryerson, but I have read the motion.  I

24   have also sat down and read the entire 83 page transcript of

15:26:18  25   this witness's testimony myself.

15:26:23  1          By the way, my understanding of what the government

2     said in its response was that you would also be submitting to

3     me the portions of the grand jury transcript that included the

4     instructions to the grand jury, and you did not submit that

15:26:35  5     with Mr. Manners' transcript.

6          MS. BROOKE:  That's correct, Your Honor.  That was my

7     error.  I believed it was submitted as an additional component

8     to that, and when pulling all the records in anticipation of

9     today's hearing realized it was not.  So it was filed on our

15:26:51  10    way to over to court.  I have an additional copy for Your

11    Honor if you'd like it now.

12          THE COURT:  Sure, that's fine.

13          Thanks.

14          With respect to the testimony of Mr. Manners before

15:27:20  15    the grand jury, and he is identified in a public filing on

16    this motion, my understanding from the government is that

17    you're going to turn over all of that testimony before trial.

18    So the question is not whether the defense should get it, the

19    question is when should the defense get it.  Is that right?

15:27:37  20          MS. BROOKE:  That's correct.

21          THE COURT:  All right.

22          Well, let me just make a few comments and I'll tell

23    you what we should do.  I do want to say on the record that I

24    saw nothing suggesting impropriety by the prosecutors in this

15:27:50  25    83 pages of transcript.  However, because this is going to be

15:27:59  1    disclosed anyway and I think the defendants did make a

2    particularized showing with respect to two events that

3    Mr. Manners said occurred before the grand jury, I'm going to

4    require the government to turn over some specific pages.  Part

15:28:13  5    of the test that I apply is not only to find a particularized

6    showing but also to disclose only those portions of the grand

7    jury transcript that relate to those.  So I'm going to require

8    the government to turn over to the defense the following

9    portions of the Manners testimony:  Page 38 line 12 through

15:28:36  10   page 40 line 9, and page 78 line 7 through page 80 line 11.

11         Now, those two excerpts concern the two instances

12   Mr. Manners describes in his declaration.  From his

13   description it's easy to see what he's talking about.

14         I don't think there's any impropriety in what was

15:29:04  15   handled and I think his memory isn't as fully accurate as it

16   would have been if he'd written that declaration the moment he

17   walked out, but it was close enough to identify them.  So the

18   government should turn them over.

19         If you think there is a basis for a motion to

15:29:18  20   dismiss, by all means feel free to file it, but I will tell

21   you it looked pretty innocuous to me upon reading it.

22         MR. RYERSON:  On that basis, and I know the

23   instructions are still forthcoming and you still need a chance

24   to review them, but part of the analysis as we understand is

15:29:34  25   also presence of any sort of curative instructions.  So I

19

15:29:37  1    don't know if that needs to be part of the Court's order --

       2           THE COURT:  I'm confident there were no curative

       3    instructions.  As I read this portion of the transcript, they

       4    were just sort of non-events as the proceeding was going

15:29:49  5    along.  It wasn't an event.

       6           But see what you think when you read it.  I tried to

       7    carefully include everything that relates to the incident in

       8    my page designations so you'll see exactly what happened, what

       9    preceded it, what followed it.  And you can then decide what

15:30:07 10    to do with it.

      11           MR. RYERSON:  Thank you, Your Honor.

      12           THE COURT:  As far as disclosing the instructions, I

      13    will look at this portion of the transcript.  I'm less

      14    persuaded that the defense has made a particularized showing

15:30:18 15    of its entitlement to get the instructions merely because "end

      16    user" is a phrase that's of importance in the case.  I'm not

      17    sure that that means you can get grand jury instructions on

      18    that issue.  But I'll look at it and consider that and get you

      19    a ruling after I read this portion of the transcript.

15:30:38 20           So in that respect I'm going to grant the motion at

      21    Docket 142 in part, and I will get you the rest of the ruling

      22    after I look at the instructions portion of the transcript.

      23           I want to talk now about the defense motion for

      24    appointment of separate counsel.  This is at Docket 174.  I

15:31:09 25    have some specific questions for defense counsel, whoever's

15:31:15   1    going to address that.

2             MR. CABOU:  That's me, Your Honor.

3             THE COURT:  Mr. Cabou, I did not see any CIPA case

4    that you cited, other than the *Sedaghaty* footnote, that says

15:31:30   5    anything about the appointment of separate counsel in a CIPA

6    case.  Did I miss something?

7             MR. CABOU:  No, Your Honor.  We believe that CIPA

8    itself is silent as to this issue and that the courts have not

9    had this particular issue come before them in reported

15:31:45  10    decisions that have been publicized.

11            The specific issue that was teed up in this case, of

12   course, as we highlighted in the motion, is the government's

13   use of -- because it has to be kind of two things, it has to

14   be a CIPA case and likely one where there's some affirmative

15:32:00  15   defense here, public authority, because the issue -- one of

16   the issues at the heart of the motion is the government's use

17   of our compelled public authority disclosure to then go

18   research things to attack us with.  Telling us they've done

19   that but not telling us the fruits of that labor.

15:32:18  20            THE COURT:  I understand that argument.

21            MR. CABOU:  All by way of saying it's a strange fact

22   pattern that's, not particularly surprising, hasn't played

23   itself out yet.

24            THE COURT:  But it is correct, I think, to say that

15:32:28  25   you haven't found any CIPA case that has ever said the

21

15:32:30  1    government has to appoint separate counsel for reviewing

2    classified information?

3         MR. CABOU:  No, Your Honor.

4         THE COURT:  And the cases you did cite, it seemed to

15:32:40  5    me, fell into two categories:  One was attorney-client

6    privilege review where what the government counsel was

7    reviewing was information that may have a defense privilege;

8    and the second category was health care information where the

9    government may become privy to sensitive health information

15:33:00 10   about a defendant.

11        Have I missed any other category?  Those seem to be

12   to me the two that you found where taint counsel was

13   appointed.

14        MR. CABOU:  Your Honor, yes those are the two

15:33:12 15   cases -- two categories that we discussed in the motion.

16        THE COURT:  Okay.  I wanted to confirm that much.

17   Are there are other points you want to make on this motion,

18   Mr. Cabou?

19        MR. CABOU:  I guess I would note a couple things,

15:33:34 20   briefly.  One is the distinction, in our view, is not whether

21   it's about health information or whether it's about

22   attorney-client privileged information, but whether it's about

23   information that goes to the substance of guilt or innocence,

24   as opposed to information that's about sources and methods by

15:33:51 25   which information was collected, as in *Roviaro* in Your Honor's

15:33:54  1   case that we discussed.

2   In this case, the classified information which was

3   referred to at least in passing on the record seems to be

4   information that the government has sought out in the

15:34:09  5   aftermath of our disclosure under Rule 12.  And that was cited

6   as a reason why we should or shouldn't get certain documents

7   and to which we don't have access.  And it's that interplay

8   that is particularly troubling, from both a due process and

9   ethical perspective, in our view, in this matter.

15:34:29  10   So while the health care and the mental health and

11   attorney-client privilege cases provide some useful context,

12   it's really the distinction between law enforcement privilege

13   case, which we agree prosecutors routinely review files for

14   *Henthorne* information and for law enforcement privilege

15:34:48  15   information about surveillance technology or what have you,

16   informant use, but in that case they're not looking at

17   information that's at the substance of guilt or innocence,

18   which is exactly what's happening here.

19   THE COURT:  Mr. Cabou, I struggle with that

15:35:04  20   distinction, which was made in your brief, for this reason:  I

21   have had cases where the government is withholding the

22   identity of a key confidential informant, or several, and the

23   defense argument, vigorously made, is we need the identity of

24   that individual to prepare our defense on the merits because

15:35:27  25   we think we know who the informant is, we think once we

15:35:31   1   identify it we can produce -- we can locate and use in trial

2   all kinds of evidence that will impeach the credibility of

3   that informant and completely undercut what that informant

4   says, and by doing that we're going to prove our innocence.

15:35:46   5        That doesn't sound to me like a category of

6   information that can be put solely in a procedural box, as

7   opposed to substance.  It goes right to the heart of the

8   defense in those cases, which is to undercut the government

9   witnesses.

15:36:03  10        So, to me, I'm not seeing this distinction between

11   procedure and substance that I think you're arguing.

12        MR. CABOU:  Your Honor, I guess I wouldn't frame it

13   as much as procedure and substance as it is about in this case

14   we have -- what we're trying to demonstrate is to carry --

15:36:19  15   we're trying demonstrate that Mr. Turi acted with public

16   authority.  This isn't a secret; we've said this all along.

17   And they're ferreting out information that they will use to

18   contest that.

19        In Your Honor's example of the confidential

15:36:33  20   informant, they're seeking impeachment information.  They're

21   going to impeach part of the government's case.

22        In our case, we're seeking information to make our

23   case.  Which is we bear some burden of production, at a

24   minimum, on the affirmative defense.  So those are different

15:36:49  25   concepts.

15:36:50    1          THE COURT:  Are you aware of any case that's drawn

2     that distinction in the context of deciding whether or not

3     separate counsel needs to be appointed?

4          MR. CABOU:  Well, Your Honor, the answer to your

15:36:59    5     question's no.  But I would note that the -- that doesn't

6     necessarily strike me as surprising because it's a fairly

7     narrow context.  Especially when you consider the relative

8     novelty of national security litigation and relatively novel

9     cases being litigated to trial or close to trial.  The fact

15:37:17   10     there's no case in the CIPA context dealing with affirmative

11     defense where the government has also sought out to

12     investigate that affirmative defense and then used that

13     information where the trial team has made offensive use of

14     that information, those are very bizarre facts.

15:37:31   15          And while -- the response, government's response, was

16     to say CIPA allows this and they're arguing that every CIPA

17     case requires a taint team.  That is not what we're saying.

18          We're saying this case requires it as a

19     constitutional matter and as an ethical matter.  We're not

15:37:48   20     seeking to establish a new principle of CIPA litigation that

21     requires a taint team in every case.  We're saying in this

22     case where the government has undertaken post-indictment

23     investigation of people listed in a compulsory disclosure at

24     the heart of the defense case for the specific purpose of

15:38:04   25     undermining it, that the government trial team has an unfair

25

15:38:07  1    advantage by virtue of the classified nature of that

2    information and that that very unique combination of factors

3    requires a taint team in this case.

4         We're not seeking to establish a broader principle of

15:38:19  5    law and we're not seeking to do anything other than make sure

6    that Mr. Turi has every opportunity to defend himself and that

7    the same prosecutors charged with convicting him are not also

8    able to avail themselves of information that they get because

9    they also happen to be lawyers for the sovereign whose

15:38:37 10    separate interest in security must also be protected.

11         And I should note we're also not challenging the

12    sovereign's interest in security.  We're not saying the United

13    States cannot advance arguments ex parte.  We're not saying

14    the United States doesn't have a very legitimate interest in

15:38:56 15    security and in classification interests that we have been at

16    pains to respect in this case from the very earliest moments

17    when we said we need clearances so we can do the right thing.

18         What we're saying is in this case the government

19    trial team impermissibly serves two masters, and that can't

15:39:12 20    happen.

21         THE COURT:  All right.  I understand that argument.

22    Thank you.

23         Any comments from the government on that issue?

24         MR. PIMSNER:  I'd like to correct a factual

15:39:21 25    inaccuracy that was stated.  We have a duty to look at all

26

15:39:24  1    information out there when we're deciding, when we're

2    investigating a case and determine whether or not to bring

3    charges.  We looked into that information long before an

4    indictment was returned, long before a public authority

15:39:38  5    defense was formally noticed, and we did our investigation to

6    make the determination whether there's any *Brady* there, or

7    looking at our case and also what else is out there.  We made

8    that determination well long before indictment time, not based

9    on anything that defense counsel has provided.

15:39:59  10           THE COURT:  All right.

11           On this issue, as indicated, the only cases that I'm

12    aware of, and I think the only cases that the defense has

13    found where the government is required to identify separate

14    lawyers to deal with a specific part of the case is when the

15:40:18  15    government is in possession of information that rightly

16    belongs to the defendant, shouldn't be disclosed to the

17    government, and shouldn't be disclosed to the prosecutors who

18    are going to be handling the case at trial.

19           So, for example, attorney-client privileged

15:40:33  20    information of the defendant that happens to be in the

21    possession of the government is reviewed by separate lawyers

22    because the lawyers trying the case should never set their

23    eyes on that information.  Or sensitive health care

24    information falls into the same category.  It's the

15:40:49  25    defendant's information; it shouldn't be known to the

15:40:52  1   prosecutor if there isn't some legitimate reason for the

2   prosecution to have it.

3           That is a very different situation from what is being

4   proposed here, which is that the government should identify

15:41:04  5   separate counsel to review information that belongs to the

6   government and is rightfully in the control of the government

7   and that that separate counsel shouldn't be communicating with

8   the trial team.

9           The fact is, from my perspective, it is always the

15:41:24 10  case that counsel in litigation, whether it be criminal or

11  civil litigation, is exposed to information on that counsel's

12  side of the case that the opponent will never see.  There's

13  lots of categories of that kind of information.  There's

14  attorney-client privileged information, there's work product,

15:41:44 15  private health care information.  In the criminal context

16  there's law enforcement sensitive information, confidential

17  informants.

18          There's an array of information that a lawyer on one

19  side of the case will see because his or her client has it and

15:41:59 20  the other side will never see.  And the notion that the

21  presence of that information should require appointment of

22  separate counsel doesn't make sense to me, even in the unique

23  setting you've described, Mr. Cabou.

24          It is always the case in those situations that the

15:42:16 25  lawyer who litigates the opponent's ability to get the

15:42:20  1    information is the lawyer who's going to be trying the case.

2    It's the lawyers who sit in this courtroom at those tables

3    that argue over privilege issues or work product issues or law

4    enforcement privilege issues.

15:42:32  5         The fact that they're actively litigating the ability

6    of their opponent to get the case -- or to get the information

7    and arguing that their opponent should not get the information

8    even though they have it has never been suggested, to my

9    knowledge, as a basis for seeking their disqualification or

15:42:50 10    arguing that that side of the case needs to find separate

11    counsel.

12         Nothing in the motion persuades me that the

13    prosecutors are gaining an unfair advantage over the defense

14    in this case by virtue of their access to classified

15:43:06 15    information.

16         If the defendants are entitled to the classified

17    information after the CIPA procedures and the relevant law,

18    defendants will get it.  If not, it's not going to be used at

19    trial.  Certainly the government isn't going to be allowed to

15:43:23 20    come in at trial and introduce into evidence a document that

21    they withheld from the defense and argued was subject to

22    classified privilege.

23         Nor do I think that there's an ethical problem going

24    on here.  It seems to me that the government attorneys in this

15:43:41 25    case serve the public interest in the prosecution.  The

15:43:46   1    citizens of the U.S. I think was the argument made in the

2    brief.  That's exactly who they serve in preserving national

3    security as well.

4         I'm confident that the attorneys representing the

15:43:58   5    government, just like the attorneys representing the defense,

6    are fully capable of understanding ethical rule 1.7 and

7    applying it to their case.

8         And so I'm going to deny the motion at Docket 174

9    seeking the appointment of separate counsel to handle

15:44:16  10    classified information.

11         I would like to talk next about an ex parte motion

12    and how it should be handled, and I can talk about it because

13    the defense gave notice to the government that it was filing

14    the ex parte motion.  And it's the ex parte motion to

15:44:53  15    authorize contact and disclosures under paragraph 14 of the

16    protective order.  And that paragraph says that if the defense

17    wishes to contact employees of national security agencies,

18    they need to get court permission to do that.

19         I've got questions, and I invite comments from both

15:45:27  20    sides on this.

21         What I've got in my hand is a motion saying we want

22    to talk to the following people, we want to talk to them about

23    these general categories of information, please authorize us

24    to talk to them under paragraph 14.  It's ex parte.  I'll get

15:45:54  25    no input from the government on whether it cares about those

15:45:58  1    people.  I'll have no input from the government on whether

2    they possess particularly sensitive information.

3         The defense rightly says the only people on our side

4    who will talk to them are the people who have had security

15:46:14  5    clearances.  But so far that's just you, Mr. Cabou.  I think

6    you received a secret clearance?  Or is it top secret?

7         MR. CABOU:  My understanding is it's top secret.

8         THE COURT:  There are levels -- even if it is -- I

9    see Mr. Pimsner shaking his head.  Even if it is, there are

15:46:29  10   levels of classification above top secret in the government, I

11   understand.  What if the individuals have information at a

12   level of classification clearance you don't have?

13        MR. CABOU:  Well, my --

14        THE COURT:  Let me finish asking the questions.  This

15:46:46  15   is a whole series of issues I'm wrestling with.

16        And even if I were to say, okay, you're authorized to

17   call them, I don't know how I'm empowered to say and they're

18   authorized to talk to you about whatever you want to talk to

19   them about.  They're not within my jurisdiction.  Presumably

15:47:09  20   they have a relationship with an agency that governs what they

21   can and can't disclose.  I don't think I can just say green

22   light, have at 'em, ask them any questions you want and

23   they're authorized by me to provide it.

24        Now, clearly we've got to figure out a way for

15:47:27  25   defense to get access to witnesses, but I'm really struggling

15:47:30  1    how, looking at this ex parte motion, I'm supposed to venture

2    into issuing orders on what is and is not permitted and with

3    whom and to cover what subjects.

4         MR. PIMSNER:  Your Honor, I think this goes part and

15:47:42  5    parcel with our *Touhy* stipulation we reached where the trial

6    team does not need to know what they're doing, but they have

7    to comply with the *Touhy* procedures for each agency they want

8    to talk to an individual who works there, and then he goes

9    through General Counsel's office, provides them whatever

15:47:57 10    information they require, and then, if there is an issue with

11    certain information not being disclosed, we just set up a

12    taint team for that where we have an attorney in Phoenix and

13    attorney back in DC who would then be involved with any *Touhy*

14    litigation with the Court ex parte without the prosecution

15:48:19 15    team being present.

16         So just because -- I don't think -- I think it's

17    premature for the Court to say, yes, go talk to them till

18    they've complied with the *Touhy* procedures and have -- and

19    that determination has been made whether or not there may be

15:48:35 20    some other privilege or some other level of classification

21    that those people cannot in fact exercise in an interview.

22    And that's why we set up a separate team to do that

23    litigation.

24         And I don't think the Court has to authorize

15:49:04 25    Mr. Cabou's contacting whatever agency, their general

15:49:10  1    counsel's office, to get that balling rolling.  That would

2    trigger in this other team.

3          THE COURT:  Do you think, Mr. Pimsner, that paragraph

4    14 applies to former employees?

15:49:22  5          MR. PIMSNER:  I did not bring it with me --

6          THE COURT:  It doesn't say former employees.  It just

7    says "employees of."  When I read it, since it didn't address

8    it, I didn't know if that, in the government's view, included

9    former employees.

15:49:35 10          MR. PIMSNER:  I believe realistically it does because

11   of the fact -- just because of the fact they left service

12   doesn't mean whatever information they may possess isn't still

13   classified.  It doesn't automatically become unclassified

14   because they no longer work there.  So I think it would have

15:49:49 15   to apply if it's regarding the subject of their employment.

16          MR. CABOU:  Your Honor, we, too, are struggling with

17   the right procedure here.  We don't pretend to have a

18   franchise on the only idea possible, but this struck us as an

19   appropriate vehicle by which to tee this issue up so we can

15:50:12 20   wrestle with it both individually and as a group.

21          My reading of *Touhy* -- and our team has struggled

22   with the regulations from the various agencies involved at

23   length.  But my understanding is that that applies only to

24   response to compulsory process.  Subpoenas for deposition,

15:50:27 25   subpoenas for documents, subpoenas for trial.  And that is not

33

15:50:30  1    what we're talking about here.

2              THE COURT:  Okay.  If that's true, then what do we do

3      to solve the issues I just identified?

4              MR. CABOU:  Your Honor, I certainly believe that --

15:50:41  5    and, you know, to the extent there are interests that the

6      agency would want -- the agency that owns the information, so

7      to speak, would want to protect, that they're entitled to be

8      heard and present information to Your Honor.

9              THE COURT:  If that's true, then shouldn't we be

15:51:01 10    following a *Touhy*-like procedure even if not substantively

11     required by the regulations?

12             MR. CABOU:  Well, Your Honor, if that's the best way

13     to get this done, we're not opposed to it.

14             THE COURT:  Well, I don't know.  I mean, if I just

15:51:12 15    said, okay, go ahead and talk to Mr. X and you called Mr. X,

16     I'm guessing Mr. X, if he's conscientious, would say before I

17     talk to you I've got to clear it with my former agency.  The

18     next call that comes to you is from counsel for that agency.

19             Now, I don't want to bank on that happening because

15:51:29 20    if Mr. X is careless and he says, sure, come talk, we end up

21     having information disclosed that shouldn't be.

22             MR. CABOU:  We don't want that either.

23             THE COURT:  So maybe the *Touhy* procedure is the best

24     one to follow even if this isn't compulsory process.

15:51:45 25             MR. CABOU:  Your Honor, at a very early moment in

this case we attempted, and I think we made reference in court
before to our attempt, to contact counsel, the general counsel
of the Central Intelligence Agency and alert them to the
presence of this litigation and try to engage in a discussion
about the best way to deal with these issues.  We got zero
response.

        We are not trying to possess information we're not
entitled to possess, we're not trying to treat carelessly
information that needs to be protected in the name of national
security, we're just want to do the right thing.

        So *Touhy* regulations themselves we don't believe
apply, and are very cumbersome and subject to a whole body of
law we don't believe necessarily applies in this context.  But
if Your Honor wanted to order, for example, we're to contact
the general counsel of the respective agencies with a -- you
know, with a letter or document to an address or to a person
that's designated by the *Touhy* counsel that the government has
designated and start to work through the issues that way, we'd
be happy to do that.

        We want to do the right thing.  We don't want it to
take another year of litigation, but we want to do the right
thing.

        THE COURT:  Well, would the fastest way to do that be
to use this *Touhy* procedure you've agreed upon?

        I mean, I'm guessing if you just send a letter to the

15:53:04  1    office of the CIA general counsel or place another phone call

2    you're going to get the same response you got last time.

3             MR. CABOU:  That's my guess, Your Honor.

4             THE COURT:  At least this is going to have at least a

15:53:15  5    designated person at DOJ who can do the reaching out.  They're

6    likely to get more of a response than you will, I'm guessing.

7             So I think if our goal is to do this efficiently,

8    this may be -- if this needs to be expanded so that it

9    encompasses that, that's fine.

15:53:34  10            I'm assuming, Mr. Pimsner, that what's happened is

11   there's somebody designated at DOJ or in your office here --

12            MR. PIMSNER:  There is.

13            THE COURT:  -- to get those calls from --

14            MR. RYERSON:  And we're aware who those people are.

15:53:47  15   They've identified them for us.

16            THE COURT:  Maybe we ought to have you go contact

17   them.  And if an issue arises and they're saying we're not

18   going to let you talk to this guy, then they and you can come

19   to me and I'll make a decision.

15:54:01  20            MR. PIMSNER:  And just so the Court's aware, agency

21   counsel have been contacted and made aware of this issue.

22   There are a number of counsel, both at State and the other

23   agency that are aware and anticipate there to be some future

24   requests for information.

15:54:18  25            THE COURT:  Okay.

15:54:21  1        MR. CABOU:  Your Honor, that's fine with us.  We will

2   contact AUSA Woo, who is here in Phoenix.  He and I know each

3   other.  We'll work through that issue.  If we hit a bump in

4   the road, we'll let you know.

15:54:32  5        THE COURT:  Okay.  What I will do is I will deny the

6   ex parte motion.  Go through Mr. Woo.  If you hit a snag, I'm

7   a phone call away to jump in and help this get resolved.

8        MR. CABOU:  Your Honor, as long as we're on the

9   subject of phone call away, I realize the docket is

15:54:48 10   ever-expanding in this case.  We're struggling with when to be

11   more formal and when to send an e-mail to chambers.  On this

12   issue, if we're kind of at a logistical point, would it be

13   appropriate to e-mail chambers and ask for a quick telephone

14   conference on that issue?

15:55:03 15        THE COURT:  Sure.  Or just call.  As you know, in

16   civil cases, people call me.  I require people to call me with

17   discovery disputes; I don't let them file anything.  And if,

18   when I get them on the phone, it's clear briefing is needed,

19   then we do some briefing pretty quickly.  Most of the time we

15:55:18 20   can work it out right there on the phone.  I'm happy on these

21   kinds of issues to field those kinds of calls.

22        MR. CABOU:  We appreciate that, Your Honor.  Thank

23   you.

24        THE COURT:  Okay.

15:55:29 25        Question for government counsel.  In the briefing on

15:55:33  1   one of these motions it was said that the government has never

2   provided the Rule 12.3 response on public authority defense

3   that we had talked about at a previous hearing.  Is that --

4          MR. PIMSNER:  The defense has never provided a

15:55:47  5   response to our request for information.

6          THE COURT:  No.  This is their 12.3 public authority

7   defense notice to you that you were required to respond to

8   within 14 days.  And earlier in the case, several months ago,

9   I'm forgetting his name, the counsel from DC was here and

15:56:06 10   argued to me that that kind of response wasn't needed, and I

11   concluded it clearly was.  It has to be provided within 14

12   days.

13          I take it that hasn't happened?

14          MR. PIMSNER:  No, that hasn't happened.  But we did

15:56:18 15   file a document asking for the defense to provide specific

16   information to support the public authority defense as the

17   rule also --

18          THE COURT:  Well, I'm going to require you to respond

19   as Rule 12.3 provides, and I'm going to require that you

15:56:37 20   provide that response by the 21st, a week from Friday.

21          MR. PIMSNER:  That won't be a problem, Your Honor.

22          THE COURT:  Okay.

23          That covers all of the motions with the exception of

24   the one we need to talk about in a separate proceeding.

15:57:01 25          I've seen the general stipulation to extend dates,

```
15:57:03   1   but without a proposal of a new schedule.  So we ought to talk
           2   about that scheduling issue and the trial date itself.  But
           3   first, let me have you raise any other points that you all
           4   think we should address today.
15:57:20   5           MR. CABOU:  Nothing from our side, Your Honor.
           6           MR. PIMSNER:  Nothing from the government.
           7           THE COURT:  Okay.  Let's look at the scheduling
           8   order, then.  I don't know if you have copies.  Docket 85.
           9           MR. PIMSNER:  I have one copy, Your Honor.
15:57:32  10           THE COURT:  Traci, would you print one.
          11           Mr. Cabou, are you in need of one?
          12           Mr. Cabou, are you in need of one?
          13           MR. CABOU:  No.  I'm sorry, Your Honor, we have it.
          14           THE COURT:  Oh, you have it.
15:57:58  15           All right.  There are a lot of dates in here, some of
          16   which are coming up pretty quickly and some of which have
          17   passed.  Clearly we haven't moved as quickly on this case as
          18   we had hoped when this was entered in December.
          19           I guess -- I guess the open-ended question I want to
15:58:35  20   ask is what the defense thinks should happen to the overall
          21   schedule, including the trial date, in light of where we are
          22   in the case.
          23           MR. CABOU:  Your Honor, I -- I think that we cannot
          24   expect to proceed to trial in a month.
15:58:53  25           THE COURT:  Nobody here's going to argue otherwise.
```

39

15:58:57   1          MR. CABOU:  And beyond that, I'm a little bit

2     hesitant to make suggestions of dates in part because of the

3     course of the Section 4 litigation, which I understand, I

4     believe, is still pending, and because we're not quite sure

15:59:10   5     how long it's going to take us to run to ground the procedure

6     of interviewing witnesses.  That will end either with a

7     roadblock in our path or with interviews.  We're trying to get

8     those done quickly.

9          I have -- never having been through this process

15:59:29  10     before, I'm just not sure how long it's going to take to

11     get -- we can get the information to Mr. Woo and he can get it

12     to agency counsel promptly, probably this week.  But I just

13     don't know how long that's going to take.  I would certainly

14     invite the government's views on what a realistic schedule

15:59:47  15     would be.

16          We continue to want to get this case to trial as

17     promptly as humanly possible.  Beyond that, I'm not sure I

18     could do any more than guess.

19          MR. PIMSNER:  You know, our position is the defense,

16:00:03  20     how much time they need.  We could be ready pretty much

21     whenever, but they're the ones that need to go through

22     different process.  Additional steps.  I'm not sure, frankly,

23     any of these witnesses he wants to talk to will talk to him

24     voluntarily.  I don't know that or not.  And so that gets us

16:00:22  25     back to being where there's going to have to be some kind of

16:00:27  1    process to bring them into court.  So I can't tell the Court

       2    this is going to take minimum of 60 days.  I just don't know.

       3           THE COURT:  Did the government make any of the expert

       4    disclosures --

16:00:44  5           MR. PIMSNER:  We did.

       6           THE COURT:  So you've made the initial expert

       7    disclosure, the Rule 404(b) notification?

       8           MR. PIMSNER:  Correct.

       9           THE COURT:  And I assume -- did the defense make an

16:00:53 10    initial expert disclosure?

      11           MR. CABOU:  No, Your Honor.

      12           THE COURT:  So that's probably as far as we've gone.

      13           MR. PIMSNER:  That is correct.

      14           THE COURT:  Well, let me tell you what I think we

16:01:07 15    ought to do.  We could go through the process of resetting

      16    this whole schedule and picking a date six months out when we

      17    think the case will be ready.

      18           I think rather than do that with this detailed a

      19    schedule, what might make sense is to move the trial date

16:01:27 20    three months, to the end of the year, and have another status

      21    conference in about two months to figure out where we are on

      22    these issues and see if we're then in a position to make a

      23    more fixed determination of when trial makes sense.  And to

      24    reimpose the various detailed pretrial deadlines that we have

16:01:47 25    in this order.

16:01:49  1           Does that make sense?

2                MR. PIMSNER:  The government does not oppose that.

3                MR. CABOU:  Just one moment, Your Honor.

4           Your Honor, that's fine with us.  Whether or not the

16:02:03  5  next status conference should be sooner than 60 days is my

6  only question.  By that point we'll have hopefully made

7  progress on a number of issues and we might want to get back

8  together.  But I assume -- now that I hear myself say that, if

9  we need that I suppose we can file a motion on that, but your

16:02:21 10  calendar might be full.

11               THE COURT:  All right.  Let's do this:  Let's move

12  the trial date to December 8th, which is a placeholder.

13          Will the defense exclude time between now and

14  December 8?

16:02:36 15               MR. CABOU:  Yes, Your Honor.

16               THE COURT:  Then let's set another status conference

17  for -- how about the afternoon of Friday, September 18th?

18  That's a little less than 60 days.

19               MR. PIMSNER:  That works for the government, Your

16:04:09 20  Honor.

21               THE COURT:  Traci, is that okay?

22               THE COURTROOM DEPUTY:  Yes, sir.

23               MR. CABOU:  That's fine, Your Honor.

24               THE COURT:  Okay.  We will then set a status

16:04:22 25  conference for 3 p.m. on the 18th of September.

16:04:25   1          In the meantime, I'm going to suspend the schedule

2     that's in Docket 85.  Something I don't think I've ever done

3     before.  But I don't think we should try to keep in place a

4     detailed schedule until we have a better idea of when the

16:04:41   5     defense is going to be able to complete its work.

6          And at the September 18th hearing we will talk about

7     whether we can then fix a firm trial date.

8          You mentioned, Mr. Cabou, the CIPA Section 4

9     proceeding.  I'll tell you it is my intention to get a ruling

16:05:03  10     out on that within the next week.  Maybe by the end of this

11     week.

12          Now, what I'm going to do is a two-part ruling.  I'm

13     going to have a public order that addresses the question I

14     asked you all to brief, which is what is the test I apply in

16:05:24  15     deciding whether or not information should be disclosed, and

16     is there a *Roviaro* balancing process?  And, if so, what

17     interests get balanced?

18          That order will just state what my view is of the

19     law, in the hope it will then generate some other law in the

16:05:43  20     circuit that gives us some clarity.  Or elsewhere.

21          Then I will enter an ex parte order that addresses

22     specifically the documents that have been submitted for my

23     review and says why or why not I think they meet the test

24     that's set forth in the public order.  And I think we'll get

16:05:59  25     those done in the next few days.

16:06:03  1          All right.  Anything else we need to address before

        2  we adjourn this proceeding?

        3          MR. PIMSNER:  Not from the government, Your Honor.

        4          MR. CABOU:  No, Your Honor.

16:06:14  5          THE COURT:  Okay.  Let's have -- we'll see if we can

        6  get Laurie up here soon.  And if, Mr. Cabou, you and counsel

        7  for the government can wait around, we'll have further

        8  discussion of that other motion.  Thanks.

        9          (End of transcript.)

16:06:35 10                          *  *  *  *  *

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

# **C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 2nd day of February, 2016.

s/ Patricia Lyons, RMR, CRR
Official Court Reporter